## WILLIE STANLEY et al. v. STATE.

No. A-4172.    Opinion Filed Oct. 25, 1924.

(229 Pac. 657.)

(Syllabus.)

1. **Jury—Racial Discrimination in Selection of Jurors Held not Shown.** There is no sufficient showing that there was any racial discrimination in favor of white persons, within the meaning of the Thirteenth and Fourteenth Amendments to the federal Constitution, in the selection of jurors.

2. **Homicide—When Instruction on Manslaughter in First Degree Proper.** Where there is some testimony showing previous mutual hostility between the accused and the deceased, and there is no positive proof as to how the fatal wounds were inflicted or which of the parties was the aggressor an instruction on manslaughter in the first degree is proper.

3. **Appeal and Error—Harmless Error—Impeaching Witness by Confronting Him with Transcript of Previous Statement.** An irregular method of impeaching a witness, by confronting such witness with a transcript of a previous statement made to the county attorney and taken in shorthand by a stenographer, showing that such statement as a whole was in conflict with the testimony given by the witness then being examined, was not prejudicial under all the circumstances shown.

4. **Trial—Evidence Proper in Chief May Become Proper in Rebuttal.** Evidence which might have been introduced in chief may, under some circumstances, become proper rebuttal evidence.

Appeal from District Court, Oklahoma County; J. I. Phelps, Judge.

Willie Stanley and another were convicted of manslaughter in the first degree, and they appeal. Affirmed.

Grant Stanley, for plaintiffs in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. Willie Stanley and Charley Stanley were, by information filed in the district court of Oklahoma county, on June 13, 1921, jointly charged with the murder of Willie

Sadler, perpetrated on June 2, 1921. By separate verdicts of the jury, they were each found guilty of manslaughter in the first degree, with the punishment of each fixed at confinement in the penitentiary for a term of five years. From separate judgments on these verdicts, they prosecute this joint appeal.

The appellants, in this opinion referred to as the defendants, were negroes, as was also Willie Sadler, the deceased. The defendants contend that there was a discrimination against negroes by the jury commissioners in selecting the regular panel of jurors, and that there was a like discrimination against negroes in the selecting of a subsequent special venire ordered by the court. All of the jurors who finally qualified were white men.

It required more than 300 pages of the record to record the proceedings in selecting the jury in this case. Ordinarily, the chief aim in selecting a jury is to procure a sufficient number of men who are competent and qualified to try the issues, as distinguished from the exclusion of others who might also be competent. It is not here contended that the jury, as finally selected, was not fair or impartial. The portions of the record examined show that there were a few negroes called on the regular panel and that these, or some of them, were excused for cause or for other reasons; that the special venire subsequently ordered was made up of business men selected at random in Oklahoma City, all of whom were white persons. It would seem that the number of prospective negro jurors summoned on the regular panel at that term of court was disproportionate to the number of white persons, but it does not affirmatively appear that this was due to racial discrimination. It was shown that there are proportionately fewer negro tax payers than white; that the prospective jurors were selected from the names

appearing on the personal property tax lists, and that jurors are summoned by registered mail; that because negroes are more migratory than white citizens, and because fewer negroes' names appear on the personal tax lists, fewer negroes were summoned. Moreover, negro defendants, as well as other litigants, often prefer white men on juries, and excuse more negroes than whites, peremptorily or for cause.

We have not scrutinized the whole of this portion of the record in detail, because it is recorded on onion-skin paper, with such dim and blurred characters as to be almost illegible; but from the examination made and from the briefs filed it appears that there is no sufficient showing that there was any discrimination, within the meaning of the Thirteenth and Fourteenth Amendments to the federal Constitution.

The testimony of the more than 40 witnesses in this case is voluminous, and in many particulars conflicting. The general trend of the more important parts of the testimony on the part of the state is to the effect that the defendants and their father and a brother, Claude Stanley, on the evening of the homicide, drove past Wright's store, at the corner of Reno and Lindsay streets, in Oklahoma City, going south, at a little past 5 o'clock, and that later, at a little before sunset, came back into Reno street and sent into the Wright store, where Charley bought a cigar; that the two men then walked up the Missouri, Kansas & Texas Railroad track to the place where the homicide was shortly afterwards committed.

Eddie Banks, a negro boy living near the Wright store, says he saw the defendants pass down the Katy tracks and heard them talking to Willie Sadler; that he saw them begin to fight and knock Sadler off of the railroad track, out of sight. Martin Banks, a 10 year old negro boy, corroborated the story of his brother Eddie. Adolph Wyatt's tes-

timony was to the same effect. A. C. Jackson saw a portion of the assault and saw the injured man stumble and run from the place until he fell into a wire fence, where the rescuers found him mortally wounded, stabbed in four places. Mrs. A. C. Jackson and a number of other witnesses further corroborated the witnesses preceding.

All of the witnesses were some distance away and could see no firearms, knives, or other weapons in the hands of any of the parties. The evening had advanced until it was dusk, or growing dark, and these witnesses could see the movements of the assailants and saw the deceased knocked down and off of the railroad grade, but could not testify to the details of the difficulty. Most of the witnesses saw the defendants at the Wright store and recognized them and saw them go down the tracks to where the fatal difficulty occurred, with their view uninterrupted, except that in some instances the witnesses said that there was a house and some trees which partially obstructed the view.

The defendants both testified that they went home past the Wright store that evening, practically as stated by the witnesses for the state; that they returned there a few minutes later and that Charley went into the store; that they then went up the Katy track, but at a time considerably before sunset, and that they passed the place where the crime was shown to have been committed while it was yet broad daylight, continuing on east and across the Katy bridge, without seeing the deceased, Willie Sadler; that defendant Charley Stanley went on south to his home about three blocks away and defendant Willie Stanley went to the home of a girl friend with whom he had an appointment; that they both arrived at their destinations before dark. The persons at these destinations corroborated the defendants, stating that they arrived before dark and remained at these respect-

ive places until long after the tragedy is said to have occurred—at about dark.

There is no showing that the deceased and the defendants had had any prior difficulty or any ill feeling, except that the deceased, Sadler, had been an important witness in a lawsuit between one Cade and the father of the defendants, in which Sadler testified for Cade; that Cade had prevailed in the suit and that the elder Stanley and Cade had had a fist fight that morning and that Cade was said to have been in the company of the deceased, or only a short distance away from the scene of the fatal tragedy when it occurred.

According to the state's theory, the crime was murder. The jury found the defendants guilty of manslaughter in the first degree. The deceased, when found, had no knife or weapon of any kind upon his person, and none was found near the place where the difficulty occurred. Since there was no positive testimony as to how the wounds were inflicted, or as to who began the difficulty resulting in the death of the deceased, the jury took the most favorable view of the situation possible under the state's evidence, to wit, that the killing was the result of a sudden combat, in the heat of passion, and committed in a cruel manner and by means of a dangerous weapon but without any premeditated design to effect death, and therefore found the defendants guilty of manslaughter, instead of murder.

No impelling motive is disclosed by the evidence, such as ordinarily underlies a premeditated killing. Had this been a planned assassination it is reasonable to assume that a weapon other than a pocket knife or knives would have been used; one more certain to have obtained the desired result. These and other considerations no doubt prompted the jury to return a manslaughter verdict.

Where the evidence is as positive as it is in this case that these defendants were the parties committing the assault which resulted in the death of the deceased, but the state's evidence as a whole leaves it speculative, if believed, as to whether the crime is murder or manslaughter, it is just and proper that the trial court submit the issues of both murder and manslaughter to the jury, and the fact that the jury took the most favorable view of the state's case, instead of adopting the defendant's theory or believing in toto their evidence, is not ground for reversal. Irby v. State, 18 Okla. Cr. 671, 197 Pac. 526; Harper v. State, 20 Okla. Cr. 43, 200 Pac. 879; Smith v. State, 20 Okla. Cr. 301, 202 Pac. 519; Wilmoth v. State, 20 Okla. Cr. 453, 203 Pac. 1055, 21 A. L. R. 590; Inman v. State, 22 Okla. Cr. 161, 210 Pac. 742; Willis v. State, 25 Okla. Cr. 259, 220 Pac. 72.

The defendants complain of the method pursued by the state and permitted by the court in impeaching the testimony of the defendants. The county attorney, on the night of and the day following the homicide, and while the defendants were under arrest and in the custody of the officers, took from them separate statements; neither defendant being present when the other's statement was made. The questions and answers so taken were recorded by the county attorney's shorthand reporter, and on cross-examination of the defendants at the trial he used the transcribed notes of the stenographer, and asked the defendant witnesses if those questions were asked them and those answers given. The defendants replied that, so far as they could remember, the questions as recorded were practically correct, but that their answers had not been as shown by the transcribed notes of the stenographer.

The stories of the movements of the defendants and their whereabouts at different times that evening, as shown by the

transcribed notes of the stenographer and as indicated by the testimony of the witnesses on the stand, were in many particulars conflicting. The method employed in impeaching these witnesses was irregular. The witness should have been asked, with regard to each particular question, whether such question had been propounded and whether the answer as read was the answer made by him at the time. But so far as we can see in this case this irregularity did not amount to prejudice.

Defendants also claim that these statements taken down by the stenographer were made through fear and duress; that the county attorney had threatened to send them to the electric chair unless they gave him the statements. That such threats were made was denied by both the county attorney and the stenographer who recorded the conversations. We cannot say as a matter of law that the statements were involuntary, or that their admission for purposes of impeachment was incompetent.

The testimony of the defendants and of other witnesses supporting them indicated that they were not at the place of the homicide when it occurred, thus casting doubt upon the identity of the assailants. The state, in rebuttal, thereupon introduced one Cannon, who testified that he was 75 years of age; that about the time of the tragedy he saw two negro men running over the Katy tracks, across on the cinder path about 75 feet distant, and saw them run up towards Reno street and south, at right angles to the river; that the taller and darker of the two wore a hat and was in front; the other wore a cap. He was then asked if he could recognize these men in the court room, and he pointed out the defendants and identified them positively; the taller and darker one as Charley, and the other as Willie. His testimony was somewhat shaken on cross-examination by show-

ing, in addition to his advanced age, the distance he was from the persons he identified and the fact that it was growing dark at the time he saw them; and the fact that he had not seen them in the meantime and had no previous acquaintance with them.

The defendants complain that this witness' name was not indorsed on the information, and that his testimony was evidence in chief, and not rebuttal evidence. But the state is not compelled to put all of its testimony on in chief. The identification in chief was sufficient, at that time. After the defendants had introduced testimony in support of an alibi, it was proper for the state to introduce other witnesses to further identify the assailants and this was proper rebuttal. Section 2687, Comp. Stat. 1921; Tingley v. State, 16 Okla. Cr. 639, 184 Pac. 599; Bigfeather v. State, 7 Okla. Cr. 364, 123 Pac. 1026.

It is further claimed by the defendants that the witnesses were cross-examined on collateral matters not germane to the issues. The testimony so complained of was remote and of slight significance, but we cannot say that it was purely collateral. Other points urged in defendants' brief have been duly considered, but are not deemed of sufficient importance to call for a detailed analysis.

All things considered, the judgment of the trial court should be affirmed, and it is so ordered.

MATSON, P. J., and DOYLE, J., concur.