# STATE v. LEWIS

## No. 2769

May 4, 1927.                                    255 P. 1002.

1. ROBBERY—EVIDENCE.
    Evidence *held* sufficient to sustain conviction of robbery.

2. CRIMINAL LAW—SEPARATE TRIAL.
    Showing that prosecution will produce evidence of one defendant's possession of registration certificate for same license number as automobile parked near scene of robbery *held* not good cause for separate trial of codefendant, within criminal practice act, sec. 317 (Rev. Laws, 7167), as amended by Stats. 1921, c. 100, in view of showing that both attempted to escape in such automobile and instruction to disregard such evidence as respects codefendant.

3. CRIMINAL LAW—SEPARATE TRIAL.
    To constitute "good cause for separate trial" of one of two codefendants, under criminal practice act, sec. 317 (Rev. Laws, 7167), as amended by Stats. 1921, c. 100, evidence proposed to be introduced as to one must be inadmissible as to other and afford reasonable ground for belief that latter will be prejudiced by joint trial, and mere fact that evidence admissible against one is immaterial as to other is not sufficient.

4. JURY—SPECIAL DEPUTY SHERIFF, COMPETENCY.
    Deputy sheriff, appointed in special capacity and paid by private parties, *held* not to stand in such relation to state as to be incompetent as juror, under criminal practice act, sec. 298, subd. 2 (Rev. Laws, 7148).

5. JURY—PUBLIC OFFICERS, EXEMPTION.
    While public officers are generally exempt from jury duty, they are not necessarily incompetent to serve as jurors, unless made so by statute; exemption being personal privilege, which they may claim or waive, under criminal practice act, sec. 299 (Rev. Laws, 7149).

6. JURY—DEPUTY SHERIFF, BIAS.
    Deputy sheriff is not incompetent as juror under constitutional guarantee of fair and impartial jury merely because of his position as officer.

7. JURY—LEGISLATURE'S POWER.
    It was within legislature's power to exclude holding of office, such as that of deputy sheriff, from causes for implied bias, as juror, under criminal practice act, sec. 298, subd. 2 (Rev. Laws, 7148); question being one of policy.

8. JURY—IMPLIED BIAS.
    Criminal practice act, sec. 298, subd. 2 (Rev. Laws, 7148), specifying grounds for challenge of juror for implied bias, excludes all others, such as holding of office of deputy sheriff, especially in view of section 300 (Rev. Laws, 7150).

9. JURY—IMPLIED BIAS.
    Challenge stating that juror had opinion requiring evidence to remove, based on statements by policemen and others whom he deemed reliable informants, *held* insufficient challenge for

implied bias, under criminal practice act, sec. 298, subd. 2 (Rev. Laws, 7148), as not alleging formation of unqualified opinion or belief that prisoner was guilty or not guilty of offense charged.

10. JURY—IMPLIED BIAS.

Juror stating that he had opinion, which would take evidence to remove, based on remarks of police officers which he regarded as reliable, *held* not incompetent as having formed unqualified opinion; his examination as whole indicating that opinion depended solely on whether statements heard were true and would yield readily to evidence.

11. CRIMINAL LAW—WITNESS' VIOLATION OF RULE.

Witness' willful violation of rule may be used to discredit his testimony or subject him to punishment for contempt of court, but cannot deprive party calling him of benefit of his testimony, unless such party is to blame for violation.

12. CRIMINAL LAW—WITNESS' VIOLATION OF RULE.

Refusal to strike out testimony of state's witness for violating rule *held* not error, where she was in courtroom without knowledge of state's counsel through misunderstanding because of message from assistant district attorney, who intended to call her immediately, and testified only as to defendants' identity, as to which nothing was brought out in testimony heard by her.

13. CRIMINAL LAW—EVIDENCE, PHYSICAL OBJECTS.

In robbery trial, pistol cartridges and stolen flash light, found near where one defendant lay wounded, *held* admissible, where one robber had pistol and other a flash light.

14. CRIMINAL LAW—EVIDENCE; INCRIMINATORY STATEMENTS.

Physician's testimony in robbery trial as to character of defendant's wound and his weakness and mental state *held* proper for jury to consider, in determining weight of his incriminatory statements in hospital on morning after robbery, but not sufficient to warrant their exclusion from evidence, especially in view of doctor's testimony that he was not in such stupefied condition as to influence his conversation.

15. CRIMINAL LAW—EVIDENCE TO REBUT ALIBI.

In robbery trial, testimony as to finding one defendant's overcoat in car parked near scene of robbery *held* admissible to rebut alibi set up by codefendant for both of them, though its probative force was very slight.

16. CRIMINAL LAW—EVIDENCE TO REBUT ALIBI.

Ordinarily, state must prove defendant's presence as part of issue of crime charged, but, to rebut defense of alibi, may introduce evidence of defendant's presence at or near scene of crime.

17. CRIMINAL LAW—EVIDENCE; REBUTTAL.

Admission of rebuttal testimony, which should have been more properly introduced in opening, is within trial court's sound discretion, which is not reviewable in absence of gross abuse.

18. CRIMINAL LAW—COURT'S REMARK NOT ERROR.
    Court's remark, "I think it is," in overruling objection to testimony as not in rebuttal of anything offered by defendants *held* not error as comment on weight of testimony or oral instruction to jury without defendants' consent.

### C. J.–CYC. REFERENCES

CRIMINAL LAW—16 C. J. sec. 993, p. 529, n. 37; sec. 1499, p. 729, n. 13; sec. 1225, p. 618, n. 34; p. 619, n. 40; sec. 2009, p. 787, n. 93; sec. 2103, p. 833, n. 94; sec. 2128, p. 844, n. 45–47; sec. 2186, p. 868, n. 40; sec. 2188, p. 870, n. 57; 17 C. J. sec. 3581, p. 240, n. 33; sec. 3583, p. 244, n. 63.

JURIES—35 C. J. sec. 165, p. 237, n. 92; sec. 197, p. 254, n. 88; sec. 198, p. 256, n. 4; sec. 323, p. 313, n. 22, 23, 24; sec. 370, p. 341, n. 63; sec. 430, p. 386, n. 17.

ROBBERY—34 Cyc. p. 1808, n. 78.

APPEAL from Second Judicial District Court, Washoe County; *Thomas F. Moran,* Judge.

George Lewis and William Benjamin Lewis were convicted of robbery, and they appeal. **Affirmed.**

*Dunseath & Frame,* for Appellant:

Granting of separate trials is matter of legal, not arbitrary discretion. If evidence is admissible against one codefendant, but not against another, separate trials should be allowed, providing application is made in due time on sufficient showing. Stats. 1921, c. 100; State v. Desroche, 17 So. 209; Ex Parte Hoge, 48 Cal. 5; State v. McLane, 15 Nev. 345.

Deputy sheriff is disqualified. Juror should not be interested or biased. Statute which declares person is qualified as juror who believes defendant guilty is unconstitutional. State v. McClear, 11 Nev. 46.

Witness cannot be impeached by declarations, acts or conduct of another with which he is not chargeable.

Court erred in saying "I think it is" in overruling objection that evidence was not rebuttal. Such remark was clearly comment on evidence and oral instruction, and could mean only that evidence did rebut. Black's Law Dictionary (2d ed.), 994.

Presence in court of adverse witness in violation of rule is prejudicial.

*M. A. Diskin,* Attorney-General; *Wm. J. Forman,* Deputy Attorney-General; *L. D. Summerfield,* District Attorney, and *H. L. Heward,* Deputy District Attorney, for Respondent:

Separate trials will not be granted merely because damaging testimony, admissible against one codefendant but not against another, will be presented. People v. Perry, 234 P. 894; People v. Booth, 236 P. 989; Stats. 1921, 165.

Separate trials may be granted where there is antagonism of positions of defendants. That did not exist here. State v. McLane, 15 Nev. 345.

Juror Geyer who had been deputy sheriff was privately employed and paid. Public officers are not necessarily disqualified. State v. Lewis, 71 P. 778.

Person who can lay aside opinion, be guided by law and evidence and judge fairly is competent. Particular grounds for challenge for implied bias must be stated. Rev. Laws, 7148, 7150; People v. Craig, 235 P. 721; State v. Milosovich, 42 Nev. 263.

Party is estopped who, knowing witness is present in violation of rule, neglects to call court's attention thereto. Such presence does not ipso facto render testimony incompetent; discretion is permitted. 16 C. J. 844; State v. Salge, 2 Nev. 321.

Not all evidence needs be conclusive; significant circumstances are admissible. State v. Clarke, 228 P. 582.

Evidence tending to contradict alibi is relevant in rebuttal. State v. Brown, 94 So. 401; 16 C. J. 870.

Order of proof is almost entirely in discretion of court. Defendant is not prejudiced if allowed to produce evidence to meet rebuttal testimony. 16 C. J. 868; Cooper v. State, 29 SE. 439.

Defendant objected that certain evidence was not rebuttal. Court said "I think it is. I will overrule the objection." Defendant did not object or except to remark "I think it is" at time, but now claims it was comment on evidence and oral instruction, and that court meant "I think it does" rebut. Court said "I

think it is" rebuttal. Would defendant object if court had said, "I think it is" evidence which should have been introduced in chief? State v. Clarke, 48 Nev. 134, 228 P. 582.

## OPINION

By the Court, DUCKER, J.:

Appellants were jointly informed against by the district attorney of Washoe County, tried, and convicted of the crime of robbery. They appealed from the judgment of conviction and from the order denying their motion for a new trial.

1. The evidence is sufficient to sustain the verdict and judgment, as may be readily seen from the following statement, which includes the important facts shown by the testimony:

On the night of October 14, 1926, between the hours of 11 and 12 o'clock, two men forced their way into the Yokohama laundry, in Sparks, Nevada, and robbed the proprietor, George Yamasaki, of over $100. Fifteen or sixteen dollars of the money taken was in silver, about 20 cents in pennies, and the rest in currency. After the robbers left, a flash light, which had been under a pillow on a bed, was missed. The members of the Japanese family in the house at the time of the robbery were George Yamasaki, the father, Mrs. Yamasaki, and their daughter and son, Dollie Yamasaki, and George Yamasaki, Jr., aged 11 and 16 years, respectively. The robbers tied the three former to beds in the room. Before they left the house, Officers Morris and Pryor arrived at the place. The former entered the house and kicking open one of the doors saw the two men in the room. One of the men had a gun and a flash light pointed at the officer and said, "Don't move!" The officer fired, and the door was kicked shut. The two men escaped from the house, running down an alley, with the officers in pursuit, firing at them. One of the men got into a Ford automobile and tried to start it but abandoned it, and the two ran out of sight of the officers. The officers

ordered a bystander to take the automobile to a garage. They also notified Chief of Police Fletcher, who went in search of the men. When Fletcher was at a point outside of Sparks, at a distance of about a mile from the Yokohama laundry, he saw two men coming along the railroad track from the direction of Sparks. He heard one of them say, "Can you stick it out?" He ordered them to stop and both started to run, one going on the left side of a cattle guard, and the other on the right. The one at the right side of the cattle guard said, "Don't move." Fletcher and one of the men commenced shooting at the same time. Shortly after the shooting one of the appellants, George Lewis, was found by the officers lying under a freight car wounded. He was taken to the county hospital. The next morning the officer found several pistol cartridges at the spot where the wounded man was discovered, and about three or four hundred feet from there was found a flash light. Footprints led from near where the wounded man was found to the flash light.

Appellant William Lewis was arrested the next morning in the restricted district in Reno, about 3 miles from Sparks. On his person were found $95 in currency, $16.75 in silver, and 20 cents in pennies, a certificate of registration of an automobile, and a bill of sale purporting to show sale of an automobile to William Lewis from W. R. Castle. The motor number of the car mentioned in the certificate of registration taken from the appellant William Lewis did not correspond with the motor number of the car in which the men tried to escape, but the license plates on this car bore the same number called for in the certificate of registration.

The appellants are brothers. George Lewis is 16 years old, and his brother 23. On the morning after the robbery, the younger Lewis was examined by the county physician and found to be shot through the body on the left side about an inch or an inch and a half below the apex of the heart, the bullet entering from the back. Chief of Police Fletcher and Chief of Police J. M. Kirkley, of Reno, visited the younger Lewis at the

hospital on the morning of October 15, at about 10 : 30 a. m. Both of these officers testified, substantially, that Kirkley spoke to Lewis about the robbery, and that in answer to a question by Kirkley as to which one of them tied the Japanese, Lewis said that he did not remember; that they were too drunk; that they had been drinking all the way from Fallon. Kirkley also testified that he had a conversation with William Lewis, in which he denied having anything to do with the robbery.

The witness further testified as follows:

"He said that he had left Fallon in the afternoon of the day previous, with a man named Baldy Ferguson, driving a Chevrolet car. They had driven into Reno, not stopping at Sparks, getting in late in the afternoon; that he went up and got something to eat, and was started down an alley when he was stopped by a man and asked for the price of a feed. That he had got into an argument and had a fight; that he had gone down to the restricted district and had washed his hands. I asked him who the man was that was shot, and he said he didn't know any man that was shot. I told him that there was a man shot, in the hospital—I thought it was his partner. I asked him if he had ever been in trouble. He said, 'No.' I asked him if he had ever been finger printed. He said, 'No.' I informed him that I was about to finger print him and if he had been, he might just as well tell me. He then said, 'Chief, I might as well tell you. I have been in a little trouble. I am wanted in California. You could get $50 reward for turning me over. The man that is in the hospital is my brother.' "

Both appellants were identified at the trial by George Yamasaki, Sr., George Yamasaki, Jr., and Dollie Yamasaki as the men who entered the laundry and committed the robbery. The younger Lewis was identified at the trial by Officer Morris as one of the men he saw when he opened the front door of the laundry, and as the one who stood near the car when the other was trying to start it after the robbery.

The elder Yamasaki and his son identified the flash

light found by the officers as the one that was missed from the laundry after the robbery.

The defense sought to establish an alibi by the testimony of George Lewis. His codefendant did not take the stand. The former denied any knowledge of the robbery. He accounted for his wound and the encounter of himself and his brother with Fletcher near the place of the robbery by testifying that they left Fallon on the previous afternoon in a car driven by a man named Ferguson to go to Reno. The two left Reno about midnight and went to Sparks to catch a train back to Fallon. They waited there about 15 minutes and finding no train started to walk back to Reno. They were halted by a man carrying a flash light. Thinking it was some one trying to rob them, they started to run, and he was shot. His brother tried to help him along the track, but he finally fell down and could go no further. His brother left him there, saying he would go for help. He remained where he fell until the officer found him and took him to the hospital. His brother had $148, he said, when he came to Reno, which he received on a check for the sale of three horses. Neither he nor his brother had any pistol or cartridges. They came to Reno to buy some clothes,. but finding the stores closed decided to go back without purchasing any. He could not recall that Chief Kirkley came to the hospital and questioned him on the following morning. He was suffering pain, was weak and somewhat out of his head.

Two witnesses for the defense testified to having known the elder appellant in Fallon by the name of Clark. One of them said he had known him for about a year, and the other for a few days prior to the 14th of October. The former had purchased some poultry from him about the 12th of October and paid something over $40 for it. The latter had purchased three horses from him on October 14th and paid him $150 for the horses. He gave him a check for $148 and $2 in silver.

One Barnes and his wife, the latter a sister of appellants, living near Hazen, testified that a week or so before the 14th of October William Lewis left a Ford

automobile at their place. The car had license plates on it when left. Several days before the date of the robbery it was observed by the witness that the license plates were gone from the car. Barnes believed that the license plates exhibited to him, which were on the car in Sparks, were the license plates taken from the car of appellant.

In rebuttal, A. F. Price, jailer of the Washoe County jail, testified that shortly after appellant William Lewis was brought to the jail he asked him for an overcoat and a little sweater that were in the car over at the city hall. The witness asked Joseph L. Kirkley to get them. Kirkley brought the coat over to the city hall. The witness was not positive that he saw the coat. On cross-examination the witness said that Lewis did not say that the coat was in the car at Sparks and did not say where the car was. Don Carlos, the owner of the garage to which the car was taken, testified that among the articles of clothing in the car at Sparks was a gray overcoat. Charles Hillhouse testified that a night or two after the robbery he saw an overcoat in the car at Sparks. Joseph L. Kirkley testified that on the evening following the robbery he saw an overcoat and other articles in the car at Sparks, and took them to the police station in Reno, and turned them over to one of the jailers; that he afterwards saw William Lewis wearing the overcoat in the yard of the county jail; that he thought both of the appellants had worn the coat.

2. When the case was called for trial and before the formation of the jury was commenced, the appellant George Lewis moved for a separate trial. The motion was made upon the ground that the state would offer at the trial against William Lewis evidence tending to show that there was found in his exclusive possession, when appellant George Lewis was not present, a certain identification card bearing numbers corresponding with the numbers on the license plate of a certain automobile found near the place where the offense alleged in the information was committed, and would attempt to show

that the persons committing the offense attempted to escape in said automobile. The showing made on the motion was stipulated as follows:

"Upon the trial of the case before the court, the prosecution will attempt to produce evidence to the effect that at the time of the robbery, or shortly thereafter, there was a certain Ford touring car parked near the Yokohama laundry; that the two bandits, after committing the crime of robbery, attempted to get into that Ford touring car, and because the officers were so close behind them left the car and abandoned it. That perhaps two or three hours later, the defendant William Lewis was arrested, and had on him at that time not an identification card, but a registration certificate, which called for the same license number as the car had on it when parked outside the Japanese laundry."

Section 317 of the criminal practice act, as amended by Stats. 1921, p. 165, c. 100, reads:

"When two or more defendants shall be jointly charged with a criminal offense, they shall be tried jointly, unless, for good cause shown, the court shall otherwise direct."

Does the showing in this case constitute good cause, within the meaning of the statute? Whether the trial court committed error in denying the motion depends upon the showing made at the time. This court, in the case of State v. McLane, 15 Nev. 345, in passing on a statute practically the same, said:

"The statute is plain, to the effect that separate trials are not to be ordered, unless good cause therefor is shown either by the prosecution or defense, and this implies that the party desiring a separate trial must apply for it and support his application by a sufficient showing of facts."

3. What would constitute good cause for a severance must, of course, depend upon the particular facts of each case. But to constitute good cause for a separate trial in any case the evidence proposed to be introduced as to one must be inadmissible as to the other, and of such a

nature as to afford reasonable ground for the belief that the other will be prejudiced by a joint trial. The mere fact that evidence admissible against one is not material as to the other is not, in itself, deemed sufficient ground for a separate trial. People v. Booth, 72 Cal. App. 160, 236 P. 987; People v. Perry, 195 Cal. 623, 234 P. 890; Commonwealth v. Borasky, 214 Mass. 313, 101 NE. 377; Gillespie v. People, 176 Ill. 238, 52 NE. 250.

It is doubtful if the stipulation of fact made in this case goes as far as to show that the evidence, proposed to be introduced against William Lewis, would be inadmissible against George Lewis. But that is the utmost effect that can be given to it. How the admission of the certificate of registration, which tended to prove that William Lewis was the owner of the automobile parked near the laundry, could prejudice George Lewis we are unable to perceive, especially in view of the fact that the showing was, and the evidence tended to prove, that both bandits attempted to escape in it. Moreover, the court specially instructed the jury to disregard evidence of the possession of the certificate of registration in so far as George Lewis was concerned.

Counsel for the defense relies upon certain language used by this court in State v. McLane, supra, but the situation is entirely different. The court in that case stated that each of the defendants relied for his exculpation upon establishing the guilt of his codefendant, and was of the opinion that on account of the antagonism of their position, if a proper showing of facts had been made in due time, it would have established good cause for a severance. But such a case, or one analogous to it, is not before us. We are of the opinion that the showing made was insufficient to establish good cause for a separate trial.

4. The next error assigned is the denial by the court of appellants' challenge to the juror Geyer. It developed during the examination of this officer that he was a deputy sheriff, having been appointed a special officer about a week before the trial and detailed for service at a resort, known as Lawton Springs, on nights when

dances were held there. He was not paid for his services by Washoe County, but employed privately. Appellants challenged him on the ground that he was a police officer and contend that the challenge should have been allowed for implied bias, under subdivision 2 of section 7148 of the Rev. Laws of Nevada (Cr. Prac. Act, sec. 298). The subdivision reads:

"Standing in the relation of guardian and ward, attorney and client, master and servant, landlord and tenant, debtor and creditor; or being a member of the family of the defendant, or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution shall have been instituted, or in the employment of any such parties."

It is insisted that a deputy sheriff bore such relation to the state as brought him within the category of persons made incompetent as jurors by the statute. A bare reading of the subdivision reveals that this condition is untenable. The state is a party plaintiff, and the venireman did not stand in any of the relations to it mentioned in the statute or to the complaining witness. He was a county officer, appointed in a special capacity and paid by private parties. Under these circumstances, it is questionable if he was really in the employ of the county.

5. "While public officers are generally exempt from jury duty, and ought not to be summoned on a jury, they are not necessarily incompetent to serve as jurors, unless made so by a statute." 35 C. J. 313. The exemption is a personal privilege which they may claim or waive. Section 299, Cr. Prac. Act (Rev. Laws, 7149). In Mingo v. State, 61 Tex. Cr. R. 14, 133 SW. 882, it was held that a deputy sheriff was not disqualified from serving as a juror in a criminal case. In a later case from the same state, in a capital case, it was held that a venireman had been a deputy sheriff and had served some process therein, was not ipso facto ground for challenge for cause, he being otherwise qualified. Young v. State, 91 Tex. Cr. R. 511, 240 SW. 930. See, also, Pate v. State, 158 Ala. 1, 48 So. 388; State v. Forbes, 111 La. 474, 35 So. 710.

**6, 7.** It is contended that the statute enumerating causes for implied bias, for which challenges may be taken, is unconstitutional if it does not include persons of this class. In this respect it is insisted that the right to challenge, for implied bias, one who is a deputy sheriff is essential to the full enjoyment of the right to a fair and impartial jury secured by the constitution. Counsel refers us to no authority in point on this contention, but it is argued that a deputy sheriff, by reason of his position, should be presumed to be biased in favor of the prosecution, and to this extent not impartial. As such an officer does not conduct a prosecution and receives no emoluments for a conviction, or could not possibly be benefited by it in a pecuniary way, we think the supposition that his position as an officer alone should render him incompetent as a juror, within the meaning of the constitutional guarantee, is rather too remote to be made the basis of a challenge for implied bias. Be this at it may, the proposition is one of policy, and it was within power of the legislature to exclude the holding of such an office from the causes for implied bias. We are referred to State v. McClear, 11 Nev. 39, and it is urged that this case is an authority upholding appellants' contention. We do not think so. The court held that a statute which deprived an accused of the right to challenge a juror for actual and for implied bias, for having formed or expressed an unqualified opinion upon his guilt or innocence, was in both of these respects unconstitutional. It held also that the right to challenge for the latter cause may, to some extent, be regulated by the legislature, care being always taken to preserve inviolate the right of trial by a jury of 12 impartial men. But the court nowhere in the course of its opinion decided a question similar to the point raised here.

**8.** It is further urged that the right to challenge the juror for implied bias for this cause exists independently of the statute. It is clear to us that the legislature, in specifying the several grounds of challenge for implied bias, intended the statute to be exclusive of all

others. This contention is more obvious from the terms of the succeeding statute (Rev. Laws, 7150 [Criminal Practice Act, sec. 300]), which, in part, reads:

"In a challenge for implied bias, one or more of the causes stated in section 298 must be alleged."

**9, 10.** Counsel for appellants interposed a challenge to juror Gulling for implied bias. The challenge, to say the least, was imperfectly taken. It did not state any cause for implied bias and could be disregarded in conformity with the law above quoted. It was merely stated as a cause for challenge that the juror had an opinion that it would take evidence to remove; that it was based upon statement of fact by policemen and persons whom the juror deemed reliable as informants, and which, in the very nature of the case, would render the juror not entirely impartial. This does not necessarily mean an unqualified opinion. The challenge, to have been properly taken, should have been interposed for the cause specified in the statute, that the juror had formed an unqualified opinion or belief that the prisoner was guilty or not guilty of the offense charged. State v. Raymond, 11 Nev. 98; State v. Milosovich, 42 Nev. 263, 175 P. 139. We have concluded, however, to regard the challenge as imperfectly taken and consider the objection.

Touching his qualifications, the juror (omitting repetition) testified as follows:

"Mr. Frame: Have you heard what purports to be a statement of the facts in this case? A. No; I cannot say I have.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. Have you any opinion at all formed from any source, touching the question of the guilt or innocence of the defendants? A. Well, I might, and might not. It all depends upon the evidence.

"Q. I mean at this time, would you have an opinion before hearing the evidence? A. No, sir.

"Q. I refer, of course, to your present state of mind, whether you have already heard enough of the case to form an opinion and to have an opinion touching the guilt or innocence of the defendants, that it would take

evidence to remove? A. It would take evidence to remove; yes sir.

\* \* \* \* \* \* \* \* \* \*

"Q. May I ask you from what source the opinion was formed, was it from talk of people or from newspaper reports? A. From people.

"Q. And did they purport to tell you what the facts were? A. They did.

"Q. And I will ask you whether you have heard the discussion of this case among police officers? A. I have heard some remarks from police officers—no discussion.

"Q. Did you regard the statements that you heard as being reliable? A. I did.

"Q. And probably what the evidence would be? A. Yes, sir.

"Q. And from that did you form an opinion, which is now fixed in your mind, to the extent that it would take evidence to remove that opinion? A. Well, you cannot judge a case without hearing the evidence.

"Q. Well, I mean from what you heard, have you an opinion at this time based on what you heard? A. Naturally so, that might enter into the case. That might come out in the case. I have probably heard it before hand.

"Q. From what you have heard, have you formed an opinion? A. I have formed an opinion, but it may be changed by evidence.

"Q. That is what I mean. It is an opinion and it is one that it would take evidence to remove, is it not? A. Yes, sir.

"Q. It would take evidence to take away the opinion you have, is that correct? A. It would have to be, I presume.

"Q. You are employed in the city clerk's office, in the city of Reno? A. I am; yes.

"Q. And your office is located in the city hall? A. Yes, sir.

"Q. Some of the talk you have heard is from police officers, is it not? A. Yes, sir.

"Q. And it was upon the statements that they made

that you formed the opinion that you now have? A. Yes, sir.

"Q. Well, it is then, necessarily, Mr. Gulling, an opinion based upon information that you believe to be reliable? A. Yes, sir.

"Q. And it is an opinion that it would take evidence to remove? A. Well, I don't know that it is as emphatic an opinion as that.

"Q. Would the fact that you are acquainted with the police officers, who might be witnesses in this case, influence you? A. No, sir.

"Q. In weighing the testimony of the police officers? A. No, sir.

"Q. Do you feel that your relations with the police department in the position that you occupy is such as would in any way influence your judgment in passing upon this case? A. I don't think so, no.

"Q. Do you feel that you could enter upon your duties as a juror in this case, and listen to the evidence introduced upon the witness stand, and upon that evidence, and that evidence alone, come to your conclusion? A. Yes, sir.

"Q. And you feel that you could reach your conclusion with fairness and without partiality to both parties? A. I do.

"Q. Is there anything in the relations existing between you and either the district attorney or the assistant district attorney? A. There is not.

"Q. That would influence you at all? A. No, sir.

"Q. The personnel of the attorneys, or the personnel of the witnesses, would make no difference whatever, so far as your verdict is concerned? A. No, sir.

"Q. If the evidence was conflicting as to material points in this case, especially as to the identification of the defendants, where there is a conflict between a policeman and the testimony of a person who is not a policeman, in a case of that kind, do you feel that your relations with the city government and police force is such as to in any way influence you in passing upon and weighing the evidence of that kind? A. It would depend

upon the evidence. I don't think it would be anything that would influence it otherwise.

\* \* \* \* \* \* \* \* \* \*

"The Court: Mr. Gulling, could you lay aside everything you have heard about the case, and try this case solely on the evidence produced here? A. I think so.

"Q. And you would not let what you have heard influence you if you sat in the jury box; you will be governed solely by the evidence? A. What I have heard is in the nature of evidence, which, I presume, will be brought out in this case.

"Q. You can lay that aside and take the evidence and determine the case on the evidence alone? A. Yes, sir.

"The Court: I will deny the challenge."

The challenge was not well taken. We do not believe that the examination disclosed that the juror had formed an unqualified opinion. The juror nowhere stated that he had, nor did he state anything from which the formation of an opinion of a fixed and positive character could be presumed. It does not appear that the policemen upon whose statements he had formed his opinion were witnesses in the case or knew any of the facts concerning it, or that they claimed to know the facts of the case. So far as the examination discloses, the statements heard by the juror may have been hearsay. It does not appear to have been a strong opinion. Little importance can be attached to the statement of the juror that his opinion was such that it would take evidence to remove it. Such a definition of his mental state furnishes no test of an unqualified opinion. That would naturally be true of any kind of an opinion. An impression made on the mind is not usually effaced or changed without some cause therefor, such as time, forgetfulness, further reflection, or evidence. Notwithstanding the juror stated that he believed what he heard to be true and in the nature of evidence, which, he presumed, would be brought out at the trial, he was sure that it would not influence him as a juror, but that he could lay aside the opinion he had formed and be influenced solely

by the evidence. His examination, taken as a whole, indicates that the opinion he had formed was dependent solely upon whether the statements he had heard presented a true version of the facts, and would yield readily to the evidence. Such an opinion does not disqualify. State v. Milosovich, 42 Nev. 263, 175 P. 139.

11, 12. Appellants assign error in the refusal of the court on their motion to strike out all of the testimony on direct examination of Dollie Yamasaki. The motion was based on the ground that she had violated the rule of the court, directing the witnesses to remain out of the courtroom and out of the hearing of the other witnesses when testifying. It appears that the girl was to follow her brother, George Yamasaki, on the stand. Counsel had apparently finished their examination of the latter, and the assistant district attorney, addressing the brother, said "George, send Dollie in." The court took a recess of five minutes. It was during this recess that she came into the court room and remained when court was convened until she was called to the stand. It is well settled that if a witness willfully violates such a rule of court, such violation may be used to discredit his testimony and subject him to punishment for contempt of court, but cannot operate to deprive a party calling him of the benefit of his testimony unless the party is to blame for the violation of the rule. 16 C. J. 844; State v. Salge, 2 Nev. 321. In State v. Salge some of the defendant's witnesses came in and heard a part of the testimony for the defense, and for this reason were afterwards excluded from testifying. In passing on the question, the court said:

"The record does not show how much of the evidence they heard, whether their presence was accidental, and a mere oversight in the witnesses, or whether it was a deliberate disobedience of the order of the court. Nor does the record show that the defendant himself was at all blamable for their presence. Being a prisoner at the bar, on trial, it is hardly presumable the defendant could have controlled the witnesses. No misconduct on

their part (in which the defendant did not participate) could deprive the prisoner of his right to have the testimony. If the witnesses willfully disobeyed the orders of the court, they laid themselves liable to punishment for contempt, and threw suspicion on their testimony, but did not affect the defendant's right to have the benefit of their testimony as far as it was worth anything."

This case is decisive of the question. From the record it seems highly probable that the witness did not willfully violate the rule by remaining in the courtroom, and was not there through any design of the complaining witness or counsel for the state, but was there through a misunderstanding on account of the message, sent to her to come, by assistant district attorney, who, it appears intended to put her on the stand immediately. It does not appear that counsel for the state knew she was in the room. Appellants could not have been prejudiced by the fact that she heard a part of her brother's testimony. When court convened after recess, George Yamasaki was questioned by the assistant district attorney, and the testimony given by him was concerning a diagram on a blackboard used to illustrate the relative positions of buildings, streets, alleys, rooms, beds, doors, windows, etc., at or near the scene of the robbery. In addition, counsel for the defense, on recross-examination, examined him briefly as to the movements of the two men, but nothing was brought out in the testimony after the recess as to their identity. Dollie's testimony on direct was short and elicited by five questions. She identified both of the appellants as the men who committed the robbery. The court did not err in denying the motion.

13. There was no error in admitting the pistol cartridges and flash light. One of the robbers had a pistol during the commission of the offense and afterwards used it in resisting the officers. The pistol cartridges were found at the spot where George Lewis lay wounded, and the flash light at no great distance from there. Footprints led from near where he lay to the flash light. The flash light was identified as the one missing from the laundry after the robbery. One of the men had a

flash light when Officer Morris kicked open the door. The circumstances touching the finding of these articles and the identification of the flash light as the one taken from the laundry went to the weight of the evidence, rather than to its admissibility.

14. It is insisted that the admission of statements, made by George Lewis in the hospital on the morning after the robbery, testified to by Chief of Police Kirkley, was prejudicial error. In support of this contention, it is urged that the testimony of the county physician shows that the appellant, at the time of making the statements attributed to him, was in such a weakened state and mental condition due to his wound and suffering that he could not comprehend the question asked him or what he said in reply, and that the statements were not voluntarily made. We find nothing in the testimony which indicates that the appellant was speaking under duress of any kind. The officers made no threats or promises, and as far as the record discloses assumed no hostile attitude towards the appellant. Besides, the testimony of Kirkley as to the statements made, which was substantially the same as that of Fletcher, was admitted without objection. State v. Clarke, 48 Nev. 134, 228 P. 582; State v. Jukich, 49 Nev. 217, 242 P. 590. The character of appellant's wound, his condition of shock, weakness, and mental state, testified to by the doctor, were proper matters for the jury to consider in determining the weight to be given to the statements as incriminatory circumstances, but not sufficient to warrant their exclusion. In this connection the doctor said, in answer to a question by counsel for the defense:

"A stupefied condition; he was certainly in a stupefied condition, due to internal hemorrhage, but not sufficiently as to—I don't know what you are asking me the question for, Mr. Frame, but I presume it is in regard to what conversation took place afterwards, but he was not in such a stupefied condition as to in any way influence his conversation."

The statements of the appellant were properly admitted.

**15.** It is contended that the admission of the testimony of Price, Kirkley, Fletcher, Hillhouse, and Don Carlos in regard to the overcoat constitutes error of a prejudicial nature. It is urged that this evidence was in no sense rebuttal, and if competent at all was properly a part of the state's case in chief; that it was not admissible even if it had been offered in chief, for the reason that it in no way tended to connect either of the appellants with the offense; that it was not rebuttal because it tended in no way to impeach either of the appellants. The state's theory was that the overcoat was found in the car near the scene of the robbery, and belonged to the appellant William Lewis. It is insisted that the testimony, taken as a whole, tends to prove his ownership of the coat and his knowledge that it was in the car, and that it was properly rebuttal testimony because it tends to rebut the defense of an alibi sought to be established by George Lewis for himself and William Lewis. The probative force of this testimony was very slight, but we are not prepared to say that it was without any evidentiary value whatever. Appellant William Lewis asked to have an overcoat that was in a car brought to him. The overcoat that was found in the bandit car was brought to the jail, and he was later seen wearing it. The weakness of the evidence lies in the fact that Lewis did not indicate what particular car the coat he wanted was in, but this circumstance goes to the weight of the evidence.

**16.** Ordinarily, in a criminal case, the state must prove the presence of the defendant as a part of the issue of the crime charged, and as the testimony objected to has that tendency it would seem to have been properly a part of the state's case in chief. But it is quite generally held that, where the defense of an alibi is set up, the state may in rebuttal of such defense introduce evidence of the defendant's presence at or near the scene of the crime. "Where evidence has been given on behalf of defendant to prove an alibi, the prosecution is entitled to offer rebutting evidence to prove his presence." 16 C. J. 870. See State v. Lewis, 69 Mo. 92; State v.

Maher, 74 Iowa, 77, 37 NW. 2, and other cases cited in note 57, which amply sustain the rule above quoted. Stanley v. State (Okl. Cr. App.), 229 P. 657. We are in accord with this rule and think it applicable in this case. Appellant George Lewis, by his testimony, sought to prove that he and his brother were not at the laundry at the time of the commission of the offense, but somewhere along the Southern Pacific railroad tracks, in or near Sparks. The testimony introduced tended, however slightly it may be, to show that William Lewis was elsewhere and at or near the scene of the robbery when it was committed. In this respect it was obviously rebuttal under the rule recognized, even though properly a part of the state's case in chief.

17. Furthermore, it is a generally accepted rule, regardless of the defense interposed, that where rebuttal testimony is offered, which should have been more properly introduced in the opening, it is within the sound judicial discretion of the trial court to allow it, which discretion is not reviewable in the absence of gross abuse. Goldsby v. United States, 160 U. S. 70, 16 S. Ct. 216, 40 L. Ed. 343; 16 C. J. 868.

18. During the direct examination of the witness Hillhouse on the subject of his seeing an overcoat in the car at Sparks, counsel for defense objected to one of the questions, stating, among other grounds, that the testimony offered was properly a part of the state's case in chief, and not in rebuttal of anything that was offered on behalf of the defendants. The court, overruling the objection said, "I think it is." The remark is assigned as error upon the grounds, first, that it was a comment on the weight of the testimony, and, second, that it was an oral instruction to the jury, given without the consent of the appellants. It amounts to neither. The court was not talking to the jury, but to counsel, briefly assigning a reason for its ruling. It was no more a comment on the weight of the testimony or an oral instruction than if the court had said, "it is relevant, or material, or competent."

The judgment should be affirmed, and it is so ordered.