NEW YORK OYER AND TERMINER.

APRIL, 1849.

Before EDMONDS, Justice, and two aldermen.

THE PEOPLE v. MATTHEW WOOD.

Dying declarations.
In what cases admissible in evidence.
The evidence necessary preliminary to their admission.
Their weight with the jury, and how they are to be considered by them.

THE prisoner was indicted for the murder of his wife by poison. He was an Irishman by birth, about twenty-eight years old. He had emigrated to this country about two years before this trial, and had brought the deceased with him, who was forty-two years of age, and had been by him enticed away from her mother's house and induced to marry him. Her brother testified:

"It is the fashion in our country for a young man to get a girl away and stay one night with her, and then stain her character and stand out for her fortune. My mother was able to give Susan a fortune of £10, and a cow. But he didn't stand out for the fortune. My mother's faction was the biggest."

Wood and his wife had not lived happily together. At one time he had deserted her and contributed nothing to her support until the police magistrate had compelled him to pay one dollar a week. They had, however, lived together for seven or eight months immediately preceding her death.

On the night before she was taken sick, when Wood had gone out he had told his wife not to make any cakes for breakfast until he came home. The next morning she made some cakes, cooked them and put them on a plate, and then he got up. He told her to go to the store and get some molasses. She did so, and on her return he told her to put

some of the molasses on to the cakes which he had cooked for her while she was gone. She saw he had a piece of white paper in his hand, and she asked what it was? He said it was snuff, and threw it into the fire. When she ate of the cakes she complained of the taste, and said they made her sick. He urged her to eat, saying they would do her good. She became sick, with a burning sensation in the throat and stomach, with a craving thirst, and vomitings. She died the same day.

While she was eating, a child from an adjoining room came in and ate part of one of the cakes. She was taken sick in the same way, but, after eight or ten days illness, recovered.

The neighbors urged him to go for a doctor, but he refused, saying he had no money. They told him to get a dispensary doctor. He said he didn't know where to find one. But, finally, driven by their importunity, he left the house to get one, but delaying to return, he was followed by one of the neighbors, who found him in the street, talking with some men, and on being asked if he had got a doctor, he replied that he did not know where to find one. A physician was called in by the neighbors, and he, suspecting poison, inquired what the deceased had eaten, and asked for the batter from which the cakes had been cooked; but it was found that he had thrown it out, and had washed out the pan in which it had been made; so, too, it was found that a cake which she had not eaten, but had put away in the closet, had been by him thrown into the privy. The physician ordered that the matter she should vomit up should be preserved, but, instead of doing so, the prisoner was particular to throw it immediately into the privy.

Some of the vomiting of the neighbor girl was preserved.

On a post mortem examination, arsenic was found in the liver; fifteen grains of it in the contents of the stomach; some in the stomach itself; eight grains in the cake which had been recovered from the privy, and some in the vomitings of the girl.

The external appearances which were noted were dark spots

on the belly, and on both eyes, and yellow spots and holes in the coats of the stomach; inflammation in the throat and passage to the stomach.

It was proved that the prisoner had been angry at losing his wife's fortune, and had sworn that he would be revenged on some one of the family for what they had done to him.

The deceased had retained her faculties to the last, and during the eight or ten hours that she lived after her breakfast, she had spoken very freely to the neighbors, and in his presence, of the occurrences of the day, and it was principally from her declarations that the evidence of his conduct was obtained. The moment she was taken sick, she suspected she had been poisoned, and from that time repeatedly had said that she was done for; that she had long expected it; that she expressed a wish to see a clergyman, and one of the witnesses, to whom she disclosed most of the facts, testified that their conversation began by deceased saying, "Jane, I've got what I think will do my job." I told her to be busy with the Almighty, for I didn't think she would ever live to see twelve o'clock again. She said, "The Lord have mercy on my soul, for I am going to have a short warning to face my maker. What have I done to Matthew Wood to have done this to me?"

She said she had put the pan, which had the batter in it, behind a box under the bed, until some one should come in that she could show it to, but he had taken the pan and cleaned it out, and he had never done any such thing before, or, as she expressed it, "if she had a headache he wouldn't help her; that if she was dying he wouldn't lift the chair from his backsides."

All this was said in his presence, and when the witness told him it was a bad job he had done, and he ought to be on his knees day and night, he merely answered that he had had no money in his pocket since Sunday to get any thing for her.

He said he had eaten the cakes which she left; the deceased answered him, "No, Matthew, you didn't eat them, you put them in the chamber."

The deceased also said, in his presence, that instead of pre-

10—vol. 2.

serving the vomit, as the doctor had directed, the prisoner had carried it all away, and emptied it out.

He was arrested before she died, and he told her of it, and she replied: "Matthew, if I ever did any thing wrong to you, to occasion this, may the Lord forgive you."

She also said, in his presence, that when the neighboring girl was invited to eat the cake, he had made signs to her not to eat. And it also appeared that during the day he showed a good deal of anxiety about the girl, and seemed very much frightened, and while at one time he had said he had eaten the cakes that were left, he, at another time, had told the doctor they were thrown away.

*The Judge*, in charging the jury, said that as the case depended mainly on the dying declarations of the deceased, it was important that they should know what reliance to place upon them.

Such declarations are admissible only upon a charge for the murder of the declarant, and then they are admissible only when made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth.

This rule stands on the ground of public necessity of preserving the lives of the community, by bringing manslayers to justice.

The persons whose declarations are thus admitted are considered as standing in the same situation as if they were sworn, the danger of impending death being equivalent to the sanction of an oath.

They were, therefore, to regard these declarations the same as they would any other testimony in the case, and apply to them the same tests, in order to ascertain their credibility.

There was, however, one other consideration for them. Although the court, in admitting the evidence of the declarations, had of necessity decided that the deceased was in a dying state, and was fully conscious of it, yet that did not

preclude the jury from considering that question. On the other hand, it was their duty, in determining what weight to give to her words, to inquire, and be satisfied that she was in such a condition, and was, in fact, under the solemn responsibility it imposed.

They must be satisfied that they were made under a sense of impending death, though it is not necessary that that should be so stated at the time. And that may be proved by the express language of the deceased, or her conduct, or from the fact of imminent danger, and the opinions of medical and other attendants.

All these things may be resorted to to ascertain the state of the declarant's mind, for it is the impression of immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible or reliable.

The jury were therefore to weigh her declarations as they would that of all the other testimony; the same as if she was a witness giving testimony before them.

And, as this question involved the life of a fellow being, they could not be too careful in weighing it well.

And, above all, they would look to see if there was any thing in the case testified to by others, calculated to corroborate her story, or whether that story was, in all respects, consistent with itself and the other testimony.

Thus they would consider his eating his breakfast in her absence, and sending her away that he might have the opportunity of poisoning what he cooked for her; his refusing to. eat of those cakes; his mode of accounting for their taste and color; her and the girl both eating them; both well immediately before, and both being seized with the same symptoms immediately after; his behavior when she related his action, and expressed her suspicions, in his presence; his removing the poisoned cake, after he had heard her tell where she had put it; his cleaning the dishes, a thing unusual with him; his throwing away the vomit, against the physician's specific directions to him; and his tardiness in going for medical or clerical aid

And, on the other hand, they would inquire whether her ill-feeling toward him, or any other evil motive, existed to cause her to make a false accusation of so serious a nature against him.

The prisoner was convicted of murder.