THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWARD RICKEN, Appellant.

Third Department, July 6, 1934.

*Leary & Fullerton* [*James A. Leary, Walter A. Fullerton, Stephen H. Keating* and *Lee C. Rich* of counsel], for the appellant.

*Thomas W. Wallace, District Attorney,* for the respondent.

BLISS, J. The appellant Edward Ricken was indicted by the grand jury of Schenectady county for the crime of murder in the second degree because of an alleged attack made by him with a knife upon Frank Perrone which resulted fatally to the victim. He was tried on that charge in the County Court of that county and found guilty of assault in the first degree. From this judgment he appeals.

The infliction of the fatal wounds on Frank Perrone occurred during the course of an altercation in the Liberty Lunch on Broadway in the city of Schenectady late on the evening of Easter Sunday, April 20, 1930. An eye witness who was standing on the sidewalk in front of the lunch room described the fight in the lunch room. He identified the defendant as one of those who participated in it, stated that he saw a man shoving the defendant away with a chair and that the defendant at that time had a knife in his hand, the defendant grabbed the chair with his left hand, pulled it away, made a " swipe " at the man with the chair and cut him across the abdomen. The victim grabbed himself above and below the abdomen and ran out of the door with the defendant

following him with the knife in his hand. The wounded man ran down the street to a parked car and at that point the defendant went back into the restaurant and then ran down the street. Perrone was then taken to a hospital and there died nine days later.

The question of identification of the defendant was seriously contested. The issue is sufficiently close to warrant a careful consideration of all disputed rulings on evidence.

The defendant offered certain photographs, two showing the Liberty Lunch from the street and one showing the inside of the lunch room. He proved that these photographs correctly represented the Liberty Lunch as it was on the night in question and that they showed the situation exactly the same way the windows were when the fracas occurred. It is obvious from looking at them that the photographs were taken in the day time. Two of these three photographs were for some unexplained reason refused admission as evidence. This was error. The photographs would have been of material assistance in enabling the jury to form a mental picture of the entire affair.

Certain statements accusing defendant of being his assailant made by Perrone to his brother the same night after the fight, were admitted as dying declarations. The law with relation to dying declarations has been recently summarized by the United States Supreme Court in *Shepard* v. *United States* (290 U. S. 96) as follows: " Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be ' a settled hopeless expectation ' (WILLES, J. in *Reg.* v. *Peel,* 2 F. & F. 21, 22) that death is near at hand, and what is said must have been spoken in the hush of its impending presence. *Mattox* v. *United States,* 146 U. S. 140, 151; *Carver* v. *United States,* 160 U. S. 553; 164 U. S. 694; *Rex* v. *Perry,* [1909] 2 K. B. 697; *People* v. *Sarzano,* 212 N. Y. 231, 235; 106 N. E. 87; 3 Wigmore on Evidence, §§ 1440, 1441, 1442, collating the decisions. Despair of recovery may indeed be gathered from the circumstances if the facts support the inference. *Carver* v. *United States, supra;* Wigmore, Evidence, § 1442. There is no unyielding ritual of words to be spoken by the dying. Despair may even be gathered though the period of survival outruns the bounds of expectation. Wigmore, § 1441. What is decisive is the state of mind. Even so, the state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom."

Let us now examine the record to ascertain whether the wounded man spoke without hope of recovery and in the shadow of impending death. Was his state of mind such as to have constituted a

proper substitute for the solemnity of an oath? Dr. E. MacDonald Stanton testified that the patient was suffering from a wound in the left side of his chest and was in a very marked shocked condition from loss of blood and he was a very sick man. Upon the operation shortly thereafter they found that his stomach had been cut almost in two by a knife wound and that he had lost a great deal of blood. He died nine days later as the result of this wound. The wounded man was lying on a stretcher when his brother arrived at the hospital. He found him there moaning and groaning. Other people were in the room. A doctor and a nurse were dressing his wound while the brother talked with him. The doctor did not tell him that he would not live. The only evidence of the declarant's mental state is found in his own statement, " I don't think I will live," and his reply when his brother tried to " buck him up:" " You can't kid me, I know how I feel." We find here no settled hopeless expression that certain death was approaching. The statement is consonant with hope. It exhibits an uncertainty as to what the immediate future would bring forth. At best one can there read only a belief that he was mortally wounded. This is not enough. It does not reveal the despair of recovery which must be foundation for the reception of the declarations.

The defendant urges that because he was convicted of assault in the first degree and not of a homicide the declarations of deceased were improperly received. The indictment was for murder in the second degree and the defendant was being tried for this homicide. Dying declarations are proper in such a case. It is the charge for which the defendant is being tried and not the crime of which he is finally convicted that is controlling on this point.

The defense attempted to impeach the declarant whose statements had been received as those of a dying man, by offering in evidence a certified copy of a record of declarant's conviction of a crime in the District Court of the United States. The district attorney objected and the court sustained the objection, stating that the " memory of the dead should not be desecrated." This was prejudicial error. A dying declaration is received under special circumstances as an exception to the hearsay rule. It is, in effect, testimony given out of court and the consciousness of swift and certain death is presumed to serve as a proper substitute for the solemnity of an oath as a deterrent to falsehood. There is no opportunity for cross-examination by the party against whom these declarations are received. Professor Wigmore in the second edition of his work on Evidence, section 1446, states that the declarant is open to impeachment and discrediting in the same way as other witnesses so far as such a process is feasible. Had the

declarant appeared in person as a witness upon the trial, such conviction could properly have been shown. The situation is not changed by the fact that he is not personally present. It strengthens the claim of the defendant to the right of impeachment. He has been deprived of his strongest arm of defense — cross-examination, and to now deprive him of the benefits of impeachment would be carrying the exception to unwarranted limits. Dying declarations are to be regarded as any other testimony in the case and the same tests are to be applied to ascertain their credibility. (*People* v. *Wood*, 2 Edm. Sel. Cas. 71; *People* v. *Knapp*, 1 id. 177; *Carver* v. *United States*, 164 U. S. 694.) We cannot say that the declarations of the deceased himself, naming the defendant as his assailant, coupled with the remark of the court about desecrating the dead, was not the turning point in the minds of the jury.

Appellant raises the further question that the verdict was a compromise because it is undisputed that the wound which deceased received was the cause of death and that therefore, the conviction should have been for homicide or he should have been acquitted. He urges that the jury were uncertain as to whether the defendant actually participated in the killing and that as the result they compromised upon a conviction for assault. Assault in the first degree, as defined by section 240 of the Penal Law, in so far as applicable to this case, consists of assault with a deadly weapon and with intent to kill or to commit a felony upon the person of the one assaulted. The Court of Appeals in *People* v. *Santoro* (229 N. Y. 277, 282), in discussing this crime, writes: " In an accusation of the crime of assault in the first degree the presence of an intent to kill a human being is an essential ingredient of the crime and must be averred in the indictment. The intent is the essence or gist of the offense, which is saved from that of murder by the fact that the assault did not cause death."

In the instant case it is undisputed that the assault did cause death. The only theory upon which the verdict could be justified is that the jury did not accept this undisputed testimony and this seems incredible in view of its strength. They were not instructed as to this phase of the case. As the judgment of conviction is to be reversed for other reasons we need not decide this particular point. It is called to the attention of the court below so that upon the next trial the subject may be properly covered in the charge. It is quite apparent that there was considerable confusion in the minds of the jury as to just what they might convict the defendant of, because they first returned a verdict of guilty of manslaughter in the third degree, a crime which does not exist.

The request of the defendant that the court charge with relation to the credibility to be accorded the testimony of the witness Spath and the various elements the jury might consider in determining the weight of such credibility was clearly proper and should not have been refused. Also, in the charge that the jury should use " a much finer test " in weighing the testimony of the brother of the deceased than that of Spath, the error is so apparent as to need no discussion.

The judgment of conviction should be reversed and a new trial granted.

HILL, P. J., RHODES, MCNAMEE and CRAPSER, JJ., concur.

Judgment of conviction reversed and new trial granted.