Frederick D. Dugan, J.
These proceedings pretrial are to *323 determine (1) if certain statements made by the decedent may be received in evidence upon the trial as dying declarations and (2) if certain statements by the defendant are to be suppressed under CPL 710.20.
Trooper R. C. Dodge was wounded by gunshots on June 30, 1974 and died some 30 hours later. The defendant who was also wounded is charged with the murder of the trooper in violation of section 125.25 of the Penal Law, prior to its amendment by chapter 367 of the Laws of 1974, effective September 1, 1974.
DYING DECLARATIONS
The trooper made separate oral statements to several persons before his death which the prosecution proposes for evidence upon the trial of the indictment. These statements or declarations were made to a village police officer, to the surgeon, to a senior investigator and the uniformed sergeant with him and to another State Police investigator whose conversations with declarant were overheard by a nurse.
Defendant objects to each of the declarations being received in evidence upon the ground that each is hearsay and none satisfy the standards required for the dying declaration exception.
In order to determine the substance of each statement and the circumstances under which it was made by declarant, the court conducted a pretrial hearing to examine the several witnesses involved. (People v Coniglio, 79 Misc 2d 808.)
The hearing was closed and the proceedings sealed as to the public, so that unsworn versions of the testimony and any testimony or evidence found to be inadmissible would not be published to prospective jurors.
The prosecution initially examined witnesses with responsibility to carry forward proof of the declarations and the circumstances under which each was made. The defendant had the right of cross-examination on all witnesses and the right to call witnesses for direct examination on matters material and relevant to the dying declarations.
No examination was allowed to impeach the declarant upon this hearing.
The dying declaration is a recognized exception to the hearsay evidence rule. A declarant by reason of his subsequent death cannot testify nor be subject to cross-examination *324 upon the trial. His statements or declarations can only be presented by witnesses who heard what he said.
For a dying declaration to be admitted as an exception to the hearsay evidence rule, it must appear that declarant was (1) in extremis, (2) under a sense of impending death, without any hope of recovery and (3) competent as a witness were he now living. (Richardson on Evidence [10th ed], § 307, p 283.)
The dying declaration exception is applicable only in prosecutions for homicide where the death of the declarant is the subject of that charge. Only those declarations which bear upon the facts and circumstances of the declarant’s death are admissible.
The declarant, a uniformed officer of the New York State Police, was brought to the emergency service at Soldiers and Sailors Memorial Hospital at approximately 7 p.m. on Sunday, June 30, 1974 in a State Police car. He had been wounded at a cottage owned by defendant near Dresden, New York, several miles distant.
He had shotgun wounds. His upper right chest had been laid open and some internal organs were exposed.
The village police officer testified that he spoke with declarant who was then lying in the back seat of the car outside the hospital. Declarant identified himself to the policeman, stated that he had been wounded by a shotgun and identified defendant as his assailant. When he told the officer that he hurt in his chest and arm, the officer assured him that help was on the way and went with him when taken by stretcher into the emergency room.
There declarant told the officer that he thought he had shot defendant. Then he had tried to knock the defendant’s gun aside, but missed it and that defendant shot him.
The police officer testified that declarant was shakey and his body shuddering, but his voice was strong and he was moaning and crying out in pain asking for medication. Declarant asked, how badly he had been hit. The officer assured him he would be o.k. and that a doctor was coming. Declarant made no statement as to whether he thought he would live or die.
The rationale or justification for the admissibility of a dying declaration as an exception to the hearsay rule lies in the high degree of probability of trustworthiness that is assured when one speaks at a time when he believes that his death is certain and impending. "The principle * * * is that the mind, *325 impressed with the awful idea of approaching dissolution, acts under a sanction equally powerful with that which it is presumed to feel by a solemn appeal to God upon an oath.” (Richardson on Evidence [10th ed], § 306, p 283.)
The declarant must have made his declaration under a sense of impending death and without any hope of recovery which are here not shown. None of the statements to this police officer are admissible into evidence as a dying declaration.
The surgeon testified that he first attended declarant in the emergency room at the hospital at approximately 7:00 p.m. on Sunday, June 30. He had a superficial wound on his right forearm and an upper abdominal chest wound in which some of the abdominal viscera was visible.
His testimony was that declarant was alert and oriented and gave a history of having been shot. He told the surgeon he had entered a building and that he had tried to knock the gun aside and that he had been hit by the shotgun shell and knocked to the wall.
This history was given shortly before declarant underwent surgery lasting upwards of eight hours.
After relating this history, declarant spoke sensitively about his affection for his wife. There was no other testimony on the declarant’s state of mind relating to his statements to the surgeon.
Surely, the surgeon could appreciate the gravity of declarant’s wounds and we may presume that declarant understood surgery was required to save his life. But this does not constitute that subjective state of mind, that foreknowledge of impending death, that lack of hope which is requisite for these statements to the surgeon to be received in evidence as a dying declaration.
After the declarant’s conversation with his surgeon, he received preoperative medication. His surgery started at 7:40 p.m. on Sunday, June 30, and was completed at approximately 3:00 a.m. on Monday, July 1. He was then taken to the recovery room and later moved to the intensive care unit at the hospital at 5:15 a.m.
At 7:00 a.m. on Monday, Senior Investigator M. Capozzi and a uniformed State Police sergeant spoke with the declarant in the intensive care unit. He identified both of these men and *326 when the senior investigator asked declarant what happened he answered that he had opened a door and was shot.
There is no testimony or other evidence of the declarant’s state of mind at the time of this conversation. This statement by declarant is without that necessary foundation showing the requisite sense of impending death, without any hope of recovery.
The nurse who attended the declarant in the intensive care unit from 7:00 a.m. to 5:30 p.m. on Monday, July 1, testified that declarant’s general condition seemed to weaken, his color became "more jaundiced” and his lips became more blue around twelve noon. It was a noticable change. She stated that he turned critical at noon and became more critical between 1:00 and 2:00 p.m.
While he had a more meaningful blood pressure in the afternoon, it was "still very weak and still questionable”. He complained of having a great deal of pain through the trunk of his body and some time between 1:00 and 2:00 p.m. he made a new complaint that his legs were numb and that he couldn’t feel his feet. He could move his legs but he complained of numbness and coldness in his feet and stated that he couldn’t feel them. He complained of severe pain in his legs then.
At 3:00 p.m. he complained to the surgeon of numbness in his legs and considerable abdominal pain.
The nurse testified that Investigator P. Hammond came to see the declarant several times during the morning commencing at 8:00 a.m. He interviewed the declarant only once in the afternoon shortly after 1:00 p.m., when they conversed for approximately 10 minutes. She was present in the room attending to the declarant during this period, but states she doesn’t recall what was said.
She did recall that she overheard declarant and this investigator who asked, "What happened?” and declarant replied, "He shot me”. Declarant asked, "Did you get him?” and was told, "Yes”. Declarant said, "Good, then he can’t hurt anybody else”. The nurse was not sure what time this conversation took place.
Declarant’s surgeon testified that he observed the declarant on that Monday at 7:30 in the morning and again at noon. He returned at least five times during the afternoon and evening from 3:00 to 11:00 p.m. His testimony is that when he observed him around 5:00 in the afternoon that the declarant appeared *327 to begin to fail. The surgeon pronounced, declarant dead at 1:30 a.m. on Tuesday, July 2, 1974.
Investigator P. Hammond of the New York State Police had seen the declarant several times on Monday morning, July 1. He was assigned to be at the hospital to take a statement in the event that the declarant was going to die. He testified to the following conversation with declarant on Monday afternoon: "Yes, at approximately 1:15 when I went into the room to check on his condition and see how he was doing, he appeared to have failed quite a bit from the previous time I had seen him late that same morning. I asked him how he was feeling and he said, 'Not very good.’ I said, 'What do you mean?’ He said, T don’t think I am going to make it.’ I said, 'What do you mean?’ He said, T can’t live. I am shot too bad.’ I said, 'Ray, are you sure you are not going to live?’ He said, 'Yes, I can’t make it. I am shot too bad.’ I said, 'Ray, as a police officer, you know what a dying declaration is?’ He said, 'Yes.’ I said, 'If you are absolutely convinced you are not going to live, I think I should take a dying declaration from you.’ I said, T have the questions made out to make up the start of the dying declaration.’ I said, T would like to ask them, will you answer them?’ He said, 'Yes.’ At that point I had the notebook in my pocket. I took the notebook out and began reading off the questions. They were previously written. I just wrote in his answers in long-hand underneath the questions.”
The investigator had observed that declarant’s color was turning quite yellow, there was a sallow appearance to his flesh and his breathing was spasmodic, coming in short, jerky movements. He was restless, in a great deal of pain and had failed since he was seen in the morning.
The questions had been prepared at 7:30 that morning and were standard questions used in State Police procedure for taking dying declarations. The nurse was in and about the room when declarant answered the questions and the investigator wrote down his responses. Declarant did not sign the writing. When declarant became excited during the statement and started to roll back and forth, the statement was terminated.
The investigator had been to the scene of the shootings and had participated in the investigation prior to the time of the statement. He had discussed some of the matters covered in the declaration with the declarant in the morning on two *328 visits at 9:00 and 10:00 a.m. No written record was made of those statements.
The 1:20 p.m. declaration recorded by the investigator reads as follows:
Q. What is your name?
A. Ray Dodge.
Q. Where do you live?
A. R.D.#1, Almond.
Q. Do you believe that you are about to die?
A. Yes, I’m shot bad.
Q. Have you any hope of recovery from the effects of the injury you have received?
A. No, I can’t live, I’m shot too bad.
Q. Are you willing to make a true statement of the manner by which you received the injuries from which you are not suffering?
A. Yes.
Q. What happened?
A. I went to Little’s cottage, knocked on the door and called out, "Mr. Little”. He said, "Who’s there?” I said, "Trooper Dodge”. He said, "Come on in”. I opened the screen door, the other door was open, and I went in. He was laying for me. He meant to kill me. The lights were out. He stuck his gun through the door and shoved it open with the barrel. He just jumped out at me. I tried to grab his gun, but he shot me in the gut. I was going to coldcock him, but when he shot me it slammed me up against the wall. He shot me twice. The second shot nicked my arm. I shot him. He meant to kill me. He knew who I was. I had talked with him earlier. He came from behind the partition.
The narrative of the declaration bears upon the facts and circumstances of declarant’s death and declarant, if now living, would be competent as a witness. The evidence also shows that declarant was in extremis from his mortal wounds, particularly after the noticable change in his physical condition after Monday noon as testified to by the attending nurse and the investigator.
The grievous chest wound described was of such a nature that the wounded man must have realized his situation. The loss of feeling in his feet complained* of after noon, together with his complaint of severe pain and his generally deteriorating physical condition evidence the apprehension of death without hope in declarant’s mind that he expressed when he made the 1:20 p.m. declarations to the investigator beyond conjecture.
Proof of the actual danger of death and giving up hope of recovery by the declarant at the time of his declaration may *329 be proved like any other fact and can be inferred from the existing and surrounding circumstances. (People v Del Vermo, 192 NY 470; People v Ludkowitz, 266 NY 233; People v Ricken, 242 App Div 106.)
The mere fact that he lingered some 12 hours after the declaration was made does not render it incompetent for its competency depends on the state of his mind when the declaration was made and the interval between the declaration and death bears mainly on the question of the certainty of death. (People v Falletto, 202 NY 494.)
Defendant’s cross-examination brought out that every State Police officer is instructed on the legal requirements of a dying declaration and that is, of course, expected to be the case. It has been speculated that the declarations of professional law enforcement officers for this reason are open to the risk of being contrived.
Here an investigating officer with the benefit of prior interviews of the declarant and some information from the investigation prepares questions with, knowledge of the gravity of declarant’s condition. The statement is taken in question and answer form.
It is true that this encounter between two trained and disciplined officers may lack the spontaneity of a layman’s declaration in the awesome knowledge of impending death.
But contemplating this serious business of dying, we are afforded and apply the same established rule of evidence. Did the declarant subjectively sense impending death without any hope of recovery? This is the vibrant requisite which the law requires to waive the solemnity of an oath and to receive the decedent’s testimony without cross-examination.
It is held that the declaration made to Investigator P. Hammond at 1:20 p.m. on Monday, July 1, 1974, satisfies the standards of a dying declaration and may be admitted into evidence as an exception to the hearsay evidence rule.
The statements made to that investigator on Monday morning lack the requisite sense of impending death, without any hope of recovery and are not admissible as dying declarations. So too, decedent’s statements to the village police officer and the surgeon on Sunday evening and to the senior investigator and the uniformed sergeant early Monday morning are so lacking and not admissible. The statements overheard by the attending nurse on Monday are not admissible since they are *330 not shown to be part of the 1:20 p.m. Monday interview with the investigator nor do they clearly bear upon the circumstances of this case or the identity of the assailant.
The court notes that it is for the jury to determine what weight it will give to these dying declaration statements and while they are entitled to be considered as having the weight of an oath, they are not of the same value and weight as direct evidence of the witness subject to cross-examination whose demeanor when on the stand is open to the observation of the jurors. (People v Ludkowitz, 266 NY 233, supra; People v Allen, 300 NY 222.)
In the alternative, the prosecution urges that should the declarations to the village police officer or to the surgeon fail to meet the requisites of the dying declaration exception, that each may be received in evidence upon the trial as either a spontaneous declaration or as part of the res gestae. (Richardson on Evidence [10th ed], § 279, p 244 et seq.)
A spontaneous declaration, an exception to the hearsay evidence rule, is a narrative of a past transaction, usually occurring immediately before the declaration is made. The evidentiary doctrine of res gestae contemplates verbal acts forming part of the transaction or incident itself. (People v Marks, 6 NY2d 67, 71.)
The declarations to the village police officer and to the surgeon were made a substantial time after the shooting incident. They lack that spontaneity requisite as a foundation for the spontaneous declaration exception. They are not part of the res gestae. (People v Marks, supra; People v Del Vermo, 192 NY 470, supra.)
Additionally, defendant objects to those parts of the declaration here ruled admissible in evidence, "He was laying for me” and two references, "He meant to kill me”, as being conclusory statements.
Defendant contends that declarant, if living, would not have been able to testify concerning defendant’s state of mind at the time of the shooting; that had declarant been a witness upon the trial, he could not have testified to these conclusions or opinions and that the declaration is subject to the same objection.
It is held that these three statements in the declaration are conclusory and would not be proper testimony by the declarant, if living, for the reason that they invade the province of *331 the jury to determine the facts of the case. (People v Shaw, 63 NY 36; People v Haber, 221 App Div 150; Richardson on Evidence [10th ed], § 312, p 288.)
If an exhibit is to be introduced into evidence setting forth the dying declaration, these three statements therein shall be redacted by covering with opaque tape, the same to be initialed by the court when offered in evidence. The jury will be appropriately instructed upon receipt of the exhibit in evidence.
[Portion of decision denying suppression of defendant’s statements omitted.]