## BARNELL BISHOP, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 7587

August 31, 1976                    554 P.2d 266

*Morgan D. Harris,* Clark County Public Defender, and *A. Bill Maupin,* Deputy, Las Vegas, for Appellant.

*Robert List,* Attorney General, Carson City; *George E. Holt,* Clark County District Attorney, and *Dan M. Seaton* and *H. Leon Simon,* Deputies, Las Vegas, for Respondent.

## OPINION

By the Court, BATJER, J.:

Early on the morning of April 23, 1971, the burned bodies of Alfred, Ida, and John Lizzio were discovered on the floor of a fire-damaged building used by Cantrell Cleaners in Las Vegas, Nevada. The other victim, Jake Wright, with his clothing afire, managed to escape the burning building at 12:01 a.m. on April 23, 1971, and to run across Charleston Boulevard seeking help. Wright lived for 31 days after the fire and was able to describe to investigating officers and others the events of the crime as he remembered them. At trial several witnesses were permitted to relate the information Wright had given to them.

Before his death he told investigators that a black man came into the cleaning establishment, wielded a chrome pistol and said "this is a stickup," forced him, as well as Alfred Lizzio and John Lizzio, prone on the floor, went through their pockets and took the keys to the safe. During this episode Ida Lizzio came into the building. After a scuffle with the assailant she was forced to the floor. All were bound, clothing was thrown on them and cleaning solvent splashed on the clothing which was set afire. Pathologists testified that all deaths were caused by third degree burns.

On the evening of April 23, 1971, at the Southern Nevada Memorial Hospital, Wright, viewing a 1971 photograph, identified appellant as the assailant. A chrome pistol was discovered

by the police on the work bench near the victims. Bishop had redeemed that same gun from a pawn shop in Phoenix, Arizona, on April 20, 1971. One witness testified that he had seen him in a nearby 7–11 Store late on the evening of April 22, 1971.

The operator of a casino in Lovelock, Nevada, testified that Bishop had lost a considerable amount of money there between April 27 and May 1, 1971. Part of that money was silver certificates. Other testimony indicated that the victim, Alfred Lizzio, had collected silver certificates and kept them in a safe place at the cleaning establishment.

Bishop had registered at the Four Queens Hotel in Las Vegas, Nevada, on the evening of April 21, 1971, and he checked out at 6:34 a.m. on April 23, 1971. He was arrested in Reno, Nevada, on May 1, 1971. Several months after the murders a bank bag similar to one found at the cleaning establishment was inadvertently found in the room occupied by him at the Four Queens Hotel. Laundry tags in the bank bag matched tags used at Cantrell's Cleaners. The bank bag was introduced as evidence at the trial.

Bishop's traveling companion corroborated his redemption of the gun in Phoenix, Arizona. She also testified that he left the hotel room during the evening of April 22, 1971, and that she did not see him again until the morning of April 23, 1971, and on that morning she saw a bank bag in the hotel room for the first time.

Sylvester Scott testified that Bishop admitted the commission of the crime to him. Raymond Berkley testified that he heard him say: "I'm not going to fry; they can't prove anything, even though I did do it." Both were his fellow inmates in the Clark County Jail. A police officer testified that in referring to one of the jail guards, he said: "I'm going to make him number five."

Bishop took the witness stand where he admitted being at the Four Queens Hotel, claimed he sold his pistol to two black men, admitted he traveled to Reno and Lovelock, Nevada, denied any connection with the murders and denied that he had made any admission to fellow inmates or police officers. In rebuttal the state called William Rehn who testified that he saw Bishop riding in an automobile that sped through the intersection of Charleston and Maryland Parkway near Cantrell's Cleaners shortly before midnight on April 22, 1971.

The jury found Bishop guilty of four counts of murder in the first degree, robbery and second degree arson. He was sentenced to consecutive terms of life in prison without the possibility of parole on each of the murder counts, a consecutive

term of fifteen years for robbery and a consecutive term of ten years for second degree arson.

He now contends that the trial court erred in denying his pretrial motions for a change of venue and to quash the Clark County master jury panel, erred during the course of his trial when it admitted into evidence the long undiscovered bank bag and the hearsay statements and photographic identification of appellant by Jake Wright, and that it further erred when it denied his motion to dismiss the second amended information and allowed the state to present part of its case in chief on rebuttal.

We find all of appellant's assignments of error to be without merit and therefore affirm the judgment of the district court.

1. Prior to jury selection, Bishop moved to change the venue of the trial pursuant to NRS 174.455(2);[1] the court denied this motion. See Hanley v. State, 80 Nev. 248, 391 P.2d 865 (1964). He concedes that NRS 174.455 is a codification of our case law but contends that his right to due process is infringed and prejudice must be presumed by the requirement that *voir dire* examination must first be conducted and that it must become apparent to the trial court that a fair and impartial jury cannot be selected before a change of venue can be granted in a criminal action.

In support of his contentions appellant relies principally upon Irvin v. Dowd, 366 U.S. 717 (1961); Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381 U.S. 532 (1965); and Sheppard v. Maxwell, 384 U.S. 333 (1966). In each of those cases the High Court overturned a state court because, in the words of that Court, each "conviction [was] obtained in a trial atmosphere that had been utterly corrupted by press coverage." Murphy v. Florida, 421 U.S. 794, 798 (1975). We have examined the record in this case and find nothing approaching the situations described in the cases relied upon by appellant. Nowhere can be found the circus atmosphere of *Estes* or the carnival conditions of *Sheppard*. There was no television broadcast of a confession such as occurred in *Rideau* or the "barrage of inflammatory publicity immediately prior to trial" in *Irvin*. See Murphy v. Florida, supra.

The newspaper article "Voice from the Graves", about which the appellant has registered his chief complaint, was not

---

[1] NRS 174.455(2): "An application for removal of a criminal action shall not be granted by the court until after the voir dire examination has been conducted and it is apparent to the court that the selection of a fair and impartial jury cannot be had in the county where the indictment, information or complaint is pending."

inflammatory, but factual in its context. It was published on May 23, 1971. Appellant's trial did not commence until August 20, 1973.

The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. at 722. "Qualified jurors need not, however, be totally ignorant of the facts and issues involved." Murphy v. Florida, 421 U.S. at 799–800.

The appellant has failed to show that the posture or setting of his trial was inherently prejudicial or that the process of selecting the jury allows any inference of actual prejudice.

2. We turn now to consider appellant's contention that there had been discrimination in the jury selection and that the trial court erred in refusing to quash the master jury panel. A state is obligated to a defendant to impanel an impartial jury.[2] A jury selection violates the Sixth Amendment or the due process and equal protection clauses of the Fourteenth Amendment only if it can be shown that members of the appellant's race were excluded systematically from jury duty. "[P]urposeful discrimination may not be assumed or merely asserted." Swain v. Alabama, 380 U.S. 202, 205 (1965). Such discrimination must be proved. Tarrance v. Florida, 188 U.S. 519 (1903).

In Ristaino v. Ross, 96 S.Ct. 1017, 1021 n. 8 (1976), it was noted by the High Court: "In our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a *per se* rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion. See Connors v. United States, 158 U.S. 408, 415 (1895)."

In authority relied upon by appellant it was held that systematic exclusion or underrepresentation of Negroes summoned for jury duty does not comply with the equal protection clause of the Fourteenth Amendment. Brown v. Allen, 344 U.S. 443

---

[2] A criminal defendant in a state court is guaranteed an "impartial jury" by the Sixth Amendment as applicable to the States through the Fourteenth Amendment. Duncan v. Louisiana, 391 U.S. 145 (1968). Principles of due process also guarantee a defendant an impartial jury. See, e.g., Irvin v. Dowd, 366 U.S. 717, 722 (1961).

(1953). Here the trial court, after a long and extensive hearing, found as a matter of fact a "possibility of *de minimis* underrepresentation of persons of the Negro race," but no showing of intentional or purposeful exclusion. Therefore, the requirement of significant exclusion or underrepresentation was not met. Brown v. Allen, supra.

We are not confronted with a fact pattern such as found in Norris v. Alabama, 294 U.S. 587 (1935), where there was proof that Negroes constituted a substantial segment of the population of the jurisdiction, that some Negroes were qualified to serve as jurors and that *none* had been called for jury service over an extended period of time; or as in the case of Patton v. Mississippi, 332 U.S. 463 (1947), where *no* Negro had served on the criminal court grand or petit jury for a period of thirty years; or even the facts found in Swain v. Alabama, 380 U.S. 202 (1965), cited and relied upon by both appellant and respondent, where Negroes constituted 26 percent of the population of Talladega County, Alabama, yet from 1953 to 1965 jury panels averaged 10 percent to 15 percent Negroes, and from 1950 to 1965 *no* Negro had served on a petit jury. There the High Court affirmed the Alabama Supreme Court which had in turn affirmed the Alabama trial court's denial of Swain's motion (1) to quash the indictment, (2) to strike the trial jury venire and (3) to void the trial jury; all based on discrimination in the selection of jurors.

"Fairness in [jury] selection has never been held to require proportional representation of races upon a jury." Akins v. Texas, 325 U.S. 398, 403 (1945).

". . . Jurymen should be selected as individuals, on the basis of individual qualifications, and not as members of a race.

". . . [T]he Constitution requires only a fair jury selected without regard to race. . . . An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race.

". . . [S]ince there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible." Cassell v. Texas, 339 U.S. 282, 286–287 (1950).

In Collins v. State, 88 Nev. 9, 13, 492 P.2d 991, 993 (1972), we said: "The absence of members of one's race on a petit jury may occur. If so, it is not error. It is the systematic exclusion of members of a race or class that spoils the makeup of the jury." See also Collins v. State, 84 Nev. 599, 446 P.2d 163

(1968). This case contains no evidence to suggest an exclusion of Negroes from jury service because of race. As a matter of fact, the trial court found no significant disparity existing between the percentage of Negroes eligible for jury service and those on the jury venire. Upon this record we perceive no *prima facie* case of invidious discrimination under the Fourteenth Amendment to the United States Constitution.

3. We now consider appellant's contention that none of the statements or declarations of the victim Jake Wright, including his photographic identification of appellant, qualify as dying declarations, but even if they technically qualify they should not have been admitted because the circumstances under which they were made offered no such strong assurance of accuracy and reliability to qualify as an adequate substitute for cross examination under NRS 51.075(1).

Although the Sixth Amendment's guaranty protecting an accused's right to confront the witnesses against him was made obligatory on the states by the Fourteenth Amendment (Pointer v. Texas, 380 U.S. 400 (1965)), the United States Supreme Court has recognized the admissibility of dying declarations. Mattox v. United States, 146 U.S. 140, 151 (1892); Pointer v. Texas, supra. In *Pointer,* supra at 407, the High Court reiterated the admissibility against an accused of dying declarations as an exception to the Sixth Amendment's guarantee of confrontation and said, "Nothing we hold here is to the contrary."

Whether or not the declarations were made while the declarant believed his death was imminent must be determined preliminarily by the trial court and its ruling will remain undisturbed unless there has been an apparent abuse of discretion. Wilson v. State, 86 Nev. 320, 468 P.2d 346 (1970); State v. Scott, 37 Nev. 412, 142 P. 1053 (1914). See also, People v. Bagwell, 113 Cal.Rptr. 122 (Cal.App. 1974).

Before an accusatory statement may be admitted as a dying declaration, the evidence must demonstrate that at the time the statement was made declarant believed that his death was imminent.[3] NRS 51.335.[4]

---

[3]Some jurisdictions allow an accusatory statement to be admitted as a dying declaration only if the evidence demonstrates that at the time the statement was made (1) death was imminent, (2) declarant had a sense of impending death and (3) that death did ensue. Commonwealth

Appellant argues that the prosecution failed to show that Wright believed his death to be imminent at the time he made the accusatory statements. Of course, the best evidence of this necessary element is a direct statement by the victim; however, the sense that death was imminent may be inferred from circumstances such as the nature of the declarant's wounds or injury. Ennis v. State, 91 Nev. 530, 539 P.2d 114 (1975); Wilson v. State, 86 Nev. 320, 468 P.2d 346 (1970); State v. Teeter, 65 Nev. 584, 200 P.2d 657 (1948). If the declarant subjectively senses impending death without any hope of recovery, then there is present the vibrant requisite which the law demands to waive the solemnity of an oath and to receive the decedent's testimony without cross examination.

Here the declarant was so badly burned that one witness testified his skin was still smoking when he reached the parking lot across the street from the fire. Two other witnesses described him as "being on fire," and at that time Wright said he "might not make it." A police officer who arrived shortly after Wright reached the parking lot testified that the declarant said, "I am going to die, I know I am going to die." Another recalled his saying, "I am going to die."

During the evening of the day of the fire, in response to words of encouragement from a police officer, Wright said, "No I don't think I'm going to make it." His attending physician who was the director of the burn center at Southern Nevada Memorial Hospital described him as being burned "very significantly" (55% third degree and 10% second degree), that he had reservations about his survival, and in his experience only two or three patients who appeared to be as badly burned survived, but the possibility of death was never communicated by the physician to Wright.

Appellant contends further that there were many discrepancies in Wright's statements and photographic identification and they were made under conditions which created considerable question as to his competency and his ability to accurately and reliably relate his observation, and for those reasons they

v. Cooley, 348 A.2d 103 (Pa. 1975). Others require that the declarant, if living, would have been a competent witness to testify as to the matter. State v. Brown, 139 S.E.2d 609 (N.C. 1965); People v. Little, 371 N.Y.S.2d 726 (Yates County Ct. 1975).

⁴NRS 51.335: "A statement made by a declarant while believing that his death was imminent is not inadmissible under the hearsay rule if the declarant is unavailable as a witness."

should have been excluded as evidence by the district court. Appellant misconceives the function of the court and jury.

Once the trial judge finds from the evidence that there is sufficient foundation to admit the dying declaration then the accusatory statements are presented to the jury to be considered and weighed along with the credibility of the declarant. Wilson v. State, 86 Nev. 320, 468 P.2d 346 (1970). In State v. Scott, 37 Nev. 412, 430, 142 P. 1053, 1059 (1914), this court said: ". . . [T]he ultimate fact and the weight, credence and significance to be given to the statement when admitted is for the jury. . . ." The trial court did not abuse its discretion in ruling that Wright's verbal acknowledgment of his imminent death as well as his critical condition which was apparent to him established a predicate for his dying declarations made during the forty-eight hours after he was burned. Consequently it did not err in allowing several witnesses to relate at trial information Wright had given them during those forty-eight hours, including his photographic identification of the appellant.

4. Appellant's additional contention that Wright's photographic identification of him on the evening of April 23, 1971, was conducted in violation of his right to counsel is unsupported in law and without merit. Appellant was not arrested until May 1, 1971. The constitutional right to counsel does not attach until judicial criminal proceedings are initiated. The exclusionary rule relating to out of court identification in the absence of counsel does not apply to identification testimony based upon a police station showup or photo identification which took place before the accused has been indicted or otherwise formally charged with the criminal offense. Kirby v. Illinois, 406 U.S. 682 (1972). Thompson v. State, 85 Nev. 134, 451 P.2d 704 (1969), upon which appellant relies is inapposite because Thompson was in police custody when he was identified at the police station from a group of pictures.

The manner in which the lineup in question was conducted is outlined in detail in the record. The police officer who conducted the lineup and all witnesses who were present were carefully cross examined and there is no indication of any unfair or improper procedures. Cf. Stovall v. Denno, 388 U.S. 293 (1967); Kirby v. Illinois, supra. In Simmons v. United States, 390 U.S. 377, 384 (1968), the High Court said:

". . . [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

5. Also without merit is appellant's claim that the trial court erred in refusing to dismiss the second amended information because it failed to give adequate notice of the charges against him. As amended the information complies substantially with the mandates of Simpson v. District Court, 88 Nev. 654, 503 P.2d 1225 (1972). NRS 173.075(2).[5]

". . . The test is not whether the indictment could have been made more definite and certain. Rather, before a conviction, the indictment standing alone must contain the elements of the offense intended to be charged and must be sufficient to apprise the accused of the nature of the offense. . . . However, after a verdict or plea of guilty, every intendment must be indulged in support of the indictment or information and such a verdict or plea cures mere technical defects unless it is apparent that they have resulted in prejudice to the defendant." Laney v. State, 86 Nev. 173, 178, 466 P.2d 666, 669 (1970). The record does not reflect prejudice to appellant.

6. Prejudicial error is claimed by appellant upon the ground that a blue bank bag found some eight months after April 23, 1971, in the room occupied by him at the Four Queens Hotel was erroneously admitted into evidence. We do not agree. The bag was a relevant and material item of evidence. NRS 48.015.[6] It was identical to the other bank bag used at Cantrell Cleaners and it had a similar laundry tag; scrapings from the safe at the cleaning establishment and from the bag were similar, and appellant's traveling companion testified that she had seen the bag for the first time in the hotel room on the morning after the murders.

---

[5]NRS 173.075(2), which provides in part:

"Allegations made in one count may be incorporated by reference in another count. It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means."

[6]NRS 48.015: "As used in this chapter, 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."

Appellant argues that the passage of time between the crime date and the discovery date rendered it inadmissible. That fact goes to the weight rather than the admissibility which is within the sound discretion of the trial court and will be respected in the absence of grave abuse. See Brown v. State, 81 Nev. 397, 404 P.2d 428 (1965). The probative value of the bag as evidence outweighs any inference of prejudice. NRS 48.035(1).[7]

7. Finally appellant complains that over his objection the state was allowed to call William Rehn to rebut appellant's testimony that he was not at or near the scene of the crime. It is appellant's contention that he was unfairly and harmfully surprised by Rehn's testimony which more properly should have been introduced by the state during its case in chief. ". . . [W]here rebuttal testimony is offered, which should have been more properly introduced in the opening, it is within the sound judicial discretion of the trial court to allow it, which discretion is not reviewable in the absence of gross abuse." State v. Lewis, 50 Nev. 212, 233, 255 P. 1002, 1009 (1927); Walker v. State, 89 Nev. 281, 283–284, 510 P.2d 1365, 1367 (1973); Goldsby v. United States, 160 U.S. 70 (1895).

In Harris v. New York, 401 U.S. 222, 225 (1971), the High Court said: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77 (1969); cf. Dennis v. United States, 384 U.S. 855 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." Likewise in this case appellant testified that he was not in the vicinity when the crime occurred but at his hotel.

The trial court did not err in allowing Rehn to testify in rebuttal that he recognized appellant as a passenger in an automobile near the crime scene shortly before the fire was reported.

Affirmed.

GUNDERSON, C. J., and ZENOFF, MOWBRAY, and THOMPSON, JJ., concur.

---

[7] NRS 48.035(1): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury."